# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

-------------------------------------------------x

AFFINITY LIVING GROUP, LLC, )
and CHARLES E. TREFZGER, JR., )    Civil Action No.: 18-cv-00035
    )
    Plaintiffs, )
    )
v. )
    )    **COMPLAINT AND DEMAND FOR**
STARSTONE SPECIALTY )    **JURY TRIAL**
INSURANCE COMPANY, and )
ONEBEACON HEALTHCARE )
GROUP, )
    )
    Defendants. )

-------------------------------------------------x

Affinity Living Group, LLC ("ALG"), and Charles E. Trefzger, Jr. ("Trefzger"), by their attorneys, for their Complaint against StarStone Specialty Insurance Company ("StarStone") and OneBeacon Healthcare Group ("OneBeacon"), allege as follows:

## THE PARTIES

1.    ALG is a North Carolina limited liability company with its principal place of business in Hickory, North Carolina. ALG manages adult care homes throughout the southeastern United States, including eighty adult care homes throughout North Carolina.[1]

---

[1] N.C. Gen. Stat. 131D-2.1(3) defines the term "Adult care home" as "[a]n assisted living residence in which the housing management provides 24-hour scheduled and unscheduled personal care services to two or more residents, either directly or for scheduled needs, through formal written agreement with licensed home care or hospice agencies. Some licensed adult care homes provide supervision to persons with cognitive impairments whose decisions, if made independently, may jeopardize the safety or well-being of themselves or others and therefore require supervision. Medication in an adult care home may be administered by designated trained staff."

1

2.     ALG is a named insured under policies of liability insurance that were issued by Defendants StarStone and OneBeacon.

3.     Trefzger is the President and Chief Executive Officer of ALG, is a resident of North Carolina, and is a named insured under policies of professional liability insurance that were issued by Defendants StarStone and OneBeacon.

4.     StarStone is, upon information and belief, a wholly owned subsidiary of Enstar Group, which is incorporated in Bermuda and has a principal place of business in London, England.

5.     OneBeacon is, upon information and belief, incorporated in Bermuda with a principal place of business for U.S. operations in Minneapolis, Minnesota.

## JURISDICTION AND VENUE

6.     This Court has original jurisdiction of this dispute under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds $75,000 and the dispute is between citizens of different states.

7.     Venue is proper under 28 U.S.C. §1391(b)(3) because all Defendants are subject to personal jurisdiction in this district.

## THE FACTS GIVING RISE TO THIS ACTION

*The Underlying Action*

8.     On about June 17, 2016, Stephen Gugenheim, a Raleigh, North Carolina-based personal injury attorney (the "Relator"), filed a complaint under seal in the United States District Court for the Eastern District of North Carolina against ALG, Trefzger, and 47 other corporate entities pursuant to the federal False Claims Act, 31 U.S.C. § 3729, *et*

2

*seq.* (the "FCA") and the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605, *et seq.* (the "NC FCA").

9.     The lawsuit is currently pending before the United States District Court for the Eastern District of North Carolina under Case No. 16-cv-00410-BO (the "Underlying Action").

10.     The Underlying Action was filed under the whistleblower, or "*qui tam,*" provisions of the FCA and the NC FCA. The plaintiff in the Underlying Action is a "relator" in the parlance of the FCA and NC FCA.

11.     In his complaint, Relator attempts to allege that ALG, Trefzger, and 47 other corporate defendants—the majority of which are operators of separate adult care homes currently managed by ALG—knowingly submitted false claims to the North Carolina Division of Medical Assistance ("DMA") for reimbursement of personal care services ("PCS") provided to Medicaid residents of certain North Carolina adult care homes from 2006 to the present, in violation of the FCA and the NC FCA.

12.     The complaint was filed under seal, as required by the FCA and the NC FCA, to give the United States and the State of North Carolina (collectively, the "Governments") an opportunity to investigate the allegations in the complaint and to join the action as plaintiffs.

13.     On May 26, 2017, after almost a year from when the initial complaint was filed, the Governments declined to intervene in the Underlying Action. The Governments' *Notice of Election to Decline Intervention* in the Underlying Action is attached as <u>Exhibit A</u>.

14.    After the Governments declined to intervene in the Underlying Action, on June 26, 2017, Relator filed a First Amended Complaint against the same defendants listed in the initial complaint. A copy of the First Amended Complaint filed in the Underlying Action is attached as Exhibit B.

15.    On July 7, 2017, the United States District Court for the Eastern District of North Carolina unsealed the case. Relator served ALG, Trefzger, and the remaining corporate defendants with the First Amended Complaint in mid-July, 2017.

16.    On October 10, 2017, ALG, Trefzger, and the remaining corporate defendants moved to dismiss the Relator's First Amended Complaint with prejudice pursuant to Rules (9)(b), 12(b)(1), and 12(b)(6) of the Federal Rules of Civil Procedure.

17.    On December 22, 2017, the United States District Court for the Eastern District of North Carolina held a hearing on the Motion to Dismiss. The court took the matter under advisement and a written order issuing a ruling is pending.

*The Liability Insurance Policies Issued by the Defendants*

*The OneBeacon Primary Policy*

18.    Defendant OneBeacon issued policy number LTC-0002020-0816 for the policy period August 1, 2016 to August 1, 2017 through a company called Homeland Insurance Company of New York (the "OneBeacon Policy"). Upon information and belief, Homeland is a wholly owned subsidiary of, or is otherwise affiliated with and controlled by, OneBeacon.

19.    The OneBeacon Policy is a "Long Term Care Organizations Professional Liability, General Liability and Employee Benefit Liability Policy." It provides coverage

4

for claims made against the Insureds up to a limit of liability of $1,000,000 per-claim, after payment of a $25,000 deductible, with a $3,000,000 aggregate limit.

20.     ALG paid $1,244,055.05 in premiums for the one year of claims-made coverage under the OneBeacon Policy.

21.     ALG has paid more than the $25,000 deductible in costs of defense in the Underlying Action.

22.     The Named Insured under the OneBeacon policy is "Affinity Living Group, LLC," including (1) "any member of a Named Insured that is a limited liability company," and (2) "any owner of a Named Insured that is not a partnership, joint venture or limited liability company."

23.     The OneBeacon Policy provides broad coverage for liabilities arising from **Professional Services.** (Words and phrases in **bold** print in the OneBeacon Policy are specifically defined terms.) Under Insuring Agreement A, the Professional Liability coverage part, the policy provides:

> The underwriter will pay up to the applicable limit of Liability in ITEM 4.A. of the Declarations [that is, $1,000,000 per claim with a $25,000 deductible] on behalf of the **Insured** any **Loss** that the **Insured** is legally obligated to pay as a result of any covered **Claim** for a **Professional Services Wrongful Act** happening on or after the **Retroactive Date** [which is April 11, 2007]; provided, that the **Claim** is first made against the **Insured** during the **Policy Period** or applicable Extended Reporting Period and reported to the Underwriter in accordance with GENERAL CONDITION (C) of this Policy.

24.     The OneBeacon Policy requires the insurer to defend ALG and Trefzger for any and all potentially covered claims, even if the allegations are groundless, false or fraudulent:

The Underwriter has the right and duty to defend any **Claim** that is covered by INSURING AGREEMENTS (A), (B), and (C) of this Policy, even if any of the allegations of such **Claim** are groundless, false or fraudulent.

25.     Insuring Agreements (B) and (C) are not relevant to the claims made against ALG in the Underlying Action. Insuring Agreement (A) provides the applicable coverage.

26.     Under North Carolina insurance law, if even one of the allegations of a Claim is potentially covered by the OneBeacon Policy, the insurer must defend the entire action.

27.     The definitions of the terms relevant to Professional Liability Insuring Agreement (A) are as follows:

(Z)     **Loss** means:

(1) for the purposes of INSURING AGREEMENTS (A), (B) and (C), any damages, settlements, judgments or other amounts (including punitive or exemplary damages if insurable under the applicable law most favorable to the insurability thereof) in excess of the applicable deductible or self-insured retention, if any, stated in ITEM 4 of the Declarations which an **Insured** is legally obligated to pay as a result of a **Claim**.

(H)     **Claim** means any written notice received by an **Insured** that any person or entity intends to hold an **Insured** responsible for a **Wrongful Act** or an **Occurrence**.

(UU)  **Wrongful Act** means any **Professional Services Wrongful Act**.

(MM) **Professional Services Wrongful Act** means:

(1) any actual or alleged act, error, or omission, or series of acts errors, or omissions, by an **insured** in rendering, or failing to render **Professional Services**;

***

6

(4) any actual or alleged violation by an **Insured** of the **Rights of Residents**.

(LL)  **Professional Services** means:

(1)  **Medical Services**;

(AA)  **Medical Services** means health care, medical care, or treatment provided to any individual, including without limitation any of the following: medical, surgical, dental, mental health, chiropractic, osteopathic, nursing, or other professional health care; the furnishing, dispensing of medications, drugs, blood, blood products, or medical, surgical, dental, or psychiatric supplies, equipment, or appliances in connection with such care; the furnishing of food or beverages in connection with such care; the providing of counseling or other services in connection with such care; and the handling of, or performance of post-mortem examinations on, human bodies.

(MM) **Professional Services Wrongful Act** means:

(1) any actual or alleged act, error, or omission, or series of acts errors or omissions, by any **Insured** in rendering, or failing to render, **Professional Services**.

(RR)  **Rights of Residents** means:

(1) any right granted to a nursing home **Resident** under any state law regulating the **Named Insured's** business as a resident health facility; or

(2) the rights of **Residents** as included in the United States Department of Health and Welfare regulations governing participation of Intermediate Care Facilities or Skilled Nursing Facilities, regardless of whether the **Named Insured's** facility(ies) is/are subject to such regulations.

28.    The First Amended Complaint makes a **Claim** for covered **Professional Services Wrongful Acts** as defined by the OneBeacon Policy.

29.    Specifically, the First Amended Complaint alleges that ALG committed a

7

covered "act or omission" in rendering, or failing to render, **Professional Services** (the provision of **Medical Services**, which include "medical, … nursing, or other professional health care") by allegedly failing to provide PCS to Medicaid residents of various North Carolina adult care homes, and by allegedly submitting claims for reimbursement and payment to DMA for such PCS even though ALG allegedly failed to provide the PCS.

30.     The First Amended Complaint also alleges that ALG violated the **Rights of Residents** ("any right granted to a nursing home **Resident** under any state law regulating the **Named Insured's** business as a resident health facility") because the provision of PCS to qualified Medicaid residents is a right of those residents under North Carolina law.

31.     ALG and Trefzger provided timely notice to OneBeacon upon receipt of the First Amended Complaint in the Underlying Action.

32.     In a letter dated August 14, 2017, OneBeacon denied all coverage, including its duty to defend, for the Underlying Action.  A copy of the OneBeacon denial letter is attached as <u>Exhibit C</u>. It cited two exclusions in the OneBeacon Policy to justify the denial. These exclusions were as follows:

> Except as otherwise provided in the Policy, this Policy does not apply to, and the Underwriter will not pay **Loss** or **Defense Expenses**, for any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged:
>
>     (4) dishonest, fraudulent, criminal or intentional malicious act, error or omission by an **Insured**; any willful violation of law, statute, rule or regulation by an **Insured**; or the gaining of any profit, remuneration or advantage by an **Insured** to which such **Insured** was not legally entitled, including, but not limited to, health care fraud; provided, however, that no such act of one **Insured** will be imputed

8

to any other **Insured** who was not aware of and did not participate in such act.

(16) **Claim** made by or on behalf of any federal, state or local government or regulatory agency or entity, including but not limited to any **Claim** alleging health care fraud and abuse or violation of the Health Insurance Portability and Accountability Act of 1996 or the Health Information Technology for Economic and Clinical Health Act, all as may be amended, or any rules or regulations promulgated thereunder.

33. In addition, OneBeacon relied on the Policy definition of the word "**Loss**" to justify its denial of a defense and indemnity. The OneBeacon Policy defines **Loss**, in part, as follows:

**Loss** shall not include:

(b) the multiple portions of any multiplied damage award;

(c) fines, penalties, sanctions, fees, government payments or taxes;

(d) amounts owed to any provider of **Medical Services** under any contract;

(e) restitution, return or disgorgement of fees, profits, charges for products or services rendered, capitation payments, premium or any other funds allegedly wrongful held or obtained;

(g) relief or redress in any form other than monetary compensation or monetary damages, including without limitation the cost of complying with any injunctive, declaratory or administrative relief;

(i) matters which are uninsurable under applicable law.

34. Under North Carolina law, a court will construe exclusions in coverage narrowly. "Exclusionary clauses are interpreted narrowly while coverage clauses are interpreted broadly to provide the greatest possible protection to the insured." *Kubit v.*

9

*MAG Mut. Ins. Co.*, 210 N.C. App. 273, 283, 708 S.E.2d 138, 147 (2011) (quoting *State Capital Ins. Co. v. Nationwide Mut. Ins. Co*., 318 N.C. 534, 542–43, 350 S.E.2d 66, 71 (1986).

35.     To determine whether it has a duty to defend its insured, an insurance company must make a proper inquiry through a reasonable investigation about the actual facts, and not merely the facts alleged in the underlying complaint.  *Kubit*, 210 N.C. App. at 292, 708 S.E.2d at 153.

36.     The law of North Carolina requires an insurer to conduct an investigation based upon a reasonable inquiry before reaching a decision about coverage.  "Where the insurer knows or could reasonably ascertain facts that, if proven, would be covered by its policy, the duty to defend is not dismissed because the facts alleged in a third-party complaint appear to be outside coverage, or within a policy exception to coverage."  *Waste Mgmt. of Carolinas, Inc. v. Peerless Ins. Co*., 315 N.C. 688, 691, 340 S.E.2d 374, 377, *reh. denied,* 316 N.C. 386, 346 S.E.2d 134 (1986) (1986)(citing 7C J. Appleman, Insurance Law and Practice § 4683).

37.     In *Kubit*, the Supreme Court held as follows: "We hold that MAG Mutual 'could reasonably [have] ascertain[ed] facts that, if proven, would be covered by its policy.' Consequently, it had a duty to defend plaintiffs even though the [underlying] Welsher complaint alleged purposes for plaintiffs' actions that would 'appear to be outside coverage.'" *Id*. (Citation omitted.)

38.     Exclusion (4) contains a significant exception: "provided, however, that no such act of one **Insured** will be imputed to any other **Insured** who was not aware of and

did not participate in such act."

39.     Had OneBeacon conducted the reasonable investigation required by North Carolina law before it denied coverage, it would have discovered that the Relator's allegations of failure to provide PCS to residents at various adult care homes managed by ALG, and subsequent submission of false claims for PCS provided to those residents, did not take place.  The exception to Exclusion (4) therefore applies.  It is impossible for any **Insured** to become aware of an act of fraud that did not actually take place.

40.     The policy expressly requires OneBeacon to defend a **Claim**, "even if any of the allegations of such **Claim** are groundless, false or fraudulent."

41.     Construed narrowly in favor of ALG and Trefzger, as North Carolina law requires, Exclusion (4) does not apply to the Claims in the Underlying Action.

42.     Construed narrowly in favor of ALG and Trefzger, as North Carolina law requires, Exclusion (16) likewise does not apply to the Claims in the Underlying Action.

43.     Exclusion (16) expressly applies only to those actions, narrowly defined, that are brought either "by" the federal or state government, or "on behalf of" the federal or state government.  It does not apply to the narrow category of actions, such as *qui tam* actions, that are brought "*ex rel.*" (that is, "in relation to information provided") by individuals, where the government is not a party.

44.     The Underlying Action is plainly not one that has been brought "by" the federal or state government.  Neither the United States nor the State of North Carolina is a party to the Underlying Action.  Indeed, both the United States and North Carolina, following their respective investigations, have declined to intervene as parties to the

Underlying Action.

45.    The phrase "on behalf of" is undefined in the OneBeacon Policy.  The ordinary meaning of that phrase is "as a representative or proxy for someone else."

46.    The Underlying Action was brought by Stephen Gugenheim, an individual. Gugenheim is not, nor is he alleged to be, a "representative of" or a "proxy for" the government.

47.    If OneBeacon had wanted to exclude coverage for "*qui tam*" actions, or for actions brought in the name of the government where the government declines to become involved, it knew how to do so expressly.  It could easily have used the phrase *qui tam* in the exclusion, instead of relying upon the ambiguous phrase "on behalf of."

48.    Moreover, OneBeacon could have included in the list of excluded claims those brought under the FCA or equivalent State statutes, as many other insurers have done in their own liability insurance policies.  Instead, the only statutes the OneBeacon exclusion mentions are "the Health Insurance Portability and Accountability Act of 1996 or the Health Information Technology for Economic and Clinical Health Act, all as may be amended, or any rules or regulations promulgated thereunder."

49.    With respect to the exclusionary provisions of the definition of **Loss**, subparts (c), (d), (g), and (i) do not apply on their face, as the First Amended Complaint makes no claim whatsoever for the kinds of relief described in those subparts.

50.    Subparts (b) and (e) do not apply to the claim in the Underlying Action for an award of attorneys' fees, which is potentially covered and, therefore, triggers OneBeacon's duty to defend.

51. The OneBeacon Policy provides that **Loss** means "any damages, settlements, judgments *or other amounts*." (Emphasis added.) The term "damages" is undefined and should, therefore, be construed broadly to comport with the reasonable expectations of an average insured.

52. Any attorneys' fees award, as claimed in the Underlying Action, is an "amount" that ALG would be "legally obligated to pay" if Gugenheim were to prevail.

53. Moreover, if OneBeacon had intended to exclude coverage for an attorneys' fee award, it could (and should) have done so. At the very least, the policy is ambiguous on the question whether a fee award may constitute "damages" or "other amounts."

54. The North Carolina Supreme Court has found that the undefined term "damages" in a liability insurance policy is ambiguous and, therefore, must be construed in favor of the insured. *C.D. Spangler Const. Co. v. Indus. Crankshaft & Eng'g Co.*, 326 N.C. 133 388 S.E.2d 557 (1990) ("Because the policy term 'damages' is uncertain and capable of several reasonable interpretations, this Court must employ the interpretation which favors the policyholder."). *Id.* at 152, 388 S.E.2d at 569.

55. An attorneys' fees award is also expressly covered by Insuring Agreement (F) to the OneBeacon Policy.

56. Insuring Agreement (F) provides coverage for **Defense and Supplementary Payments**, which include, among other things, "all costs imposed against the **Insured** in any such suit." In ordinary parlance, the average insured would reasonably expect the word "costs" in a lawsuit to include attorneys' fees.

57. If OneBeacon did not intend to cover an award of attorneys' fees, either as

damages or as "costs," it knew how to exclude such an award by express language.

58.     In fact, the Insurance Services Offices, the industry trade association that drafts standard policy provisions that OneBeacon and other insurers include in their policies, drafted just such an exclusion to the "Supplemental Payments" provision of the standard policy, for use in liability policies beginning in 2007.  That provision reads: "However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured." Commercial General Liability Form CG 00 01 12 07, ISO Properties, Inc., 2006.

59.     Case law supports the requirement that an insurer must defend a suit and pay a fee award when a cause of action in the suit includes a claim for attorneys' fees, even where the policy covers none of the other claims in the suit.

### *The StarStone Umbrella Policy*

60.     Defendant StarStone Specialty Insurance Company issued policy no. 40132E160AHL to ALG for the period August 1, 2016 to August 1, 2017 (the "StarStone Policy").

61.     The StarStone Policy provides Health Care Umbrella Insurance coverage to ALG and Trefzger in excess of the $1 million limits of liability provided by the OneBeacon primary Health Care Professional Liability policy.

62.     The limits of liability under the Starstone Policy are $5,000,000 per claim and in the aggregate.

63.     There is a "**Retained Limit**" (which functions as a deductible) in the

StarStone Policy of $25,000. ALG has paid defense costs in the Underlying Action that are well in excess of the $25,000 **retained limit**.

64. An umbrella policy provides coverage when the amounts incurred in defense, or indemnity, or both, exceed the limits of the underlying primary policy.

65. Umbrella policies typically provide that they will "drop down" and provide both defense and indemnity coverage in the event that the limits of liability in the primary policy become exhausted by the payment of defense costs, settlements, or judgments.

66. Some umbrella policies also provide that they will "drop down" and provide defense and indemnity coverage for claims against the insured that are not covered by the primary policy but that are otherwise covered, and not excluded, by the terms of the umbrella policy. The StarStone Policy contains just such a drop-down obligation.

67. Under the terms of the StarStone Policy, StarStone is liable to provide coverage to ALG and Trefzger upon the exhaustion of the **applicable underlying limit**, a defined term**.**

68. The Starstone Policy defines that term as follows:

> *Applicable underlying limit means*:
>
> 1. If the policies of **underlying insurance** apply to the **occurrence** or **medical incident**, the greater of:
>
>> a. The amount of insurance stated in the policies of **underlying insurance** in Schedule or any other available insurance less the amount by which any aggregate limit so stated has been reduced solely due to payment covered hereunder; or
>>
>> b. The **retained limit**, if any, shown in the Declaration item 7; or

15

> 2. *If the policies of* **underlying insurance** *do not apply to the* **occurrence** *or* **medical incident** *and such* **occurrence** *or* **medical incident** *is other[wise] covered hereunder, the* **retained limit.**
> (Emphasis added.)

69.     Accordingly, the **underlying applicable limit** of the StarStone Policy means the $25,000 **retained limit** of the StarStone Policy whenever the OneBeacon Policy does not apply to a claim for a **medical incident** against ALG, as long as the **medical incident** is otherwise covered by the provisions of the StarStone Policy.

70.     In other words, if the OneBeacon Policy does not apply to a claim for a **medical incident**, then ALG only needs to exhaust the $25,000 **retained limit** of the StarStone Policy to trigger StarStone's coverage obligations.

71.     As discussed above, OneBeacon asserts that the claims in the Underlying Action fall within specific exclusions in the OneBeacon Policy and that the Policy therefore does not apply to the claims against ALG and Trefzger. OneBeacon has, accordingly, denied all coverage for the Underlying Action.

72.     ALG and Trefzger dispute OneBeacon's position that the OneBeacon Policy does not apply to the claims in the Underlying Action.

73.     If, however, OneBeacon is correct, and the OneBeacon Policy does "not apply to the **occurrence** or **medical incident**" alleged in the Underlying Action, and the claim is not otherwise excluded from coverage under the StarStone Policy, then subpart 2 of the definition of **applicable underlying limit** requires StarStone to drop down and defend ALG and Trefzger in the Underlying Action.

16

74. ALG paid $343,280 in premiums for the one year of claims-made coverage provided in the StarStone Policy, an amount far in excess of what it would have paid for an umbrella policy that did not afford the kind of favorable "drop down" coverage provided by StarStone.

75. Insuring Agreement A of the StarStone Policy provides the coverage applicable to the claims in the Underlying Action. Insuring Agreement A says, in relevant part (terms in **bold** print are specially defined):

> **INSURING AGREEMENT A – CLAIMS-MADE PROFESSIONAL LIABILITY**
>
> A. We will pay on behalf of the **insured** the **ultimate net loss** in excess of the **applicable underlying limit** which the **insured** becomes legally obligated to pay as **damages** resulting from a **claim** arising out of a **medical incident**. The **medical incident** must take place on or after the Retroactive Date shown in Item 3(a) of the Declarations and before the end of the Policy Period. A **claim** for a **medical incident** must be first made against the **insured** during the Policy Period or any applicable Extended Reporting Period.

76. Insuring Agreement B provides umbrella coverage in excess of the primary Commercial General Liability coverage of the OneBeacon Policy, for claims that allege bodily injury, property damage, and personal and advertising liability, none of which are at issue in the Underlying Action.

77. The StarStone Policy defines **medical incident** as follows:

> **Medical Incident** means an alleged or actual act, error or omission in the **insured's** rendering or failure to render **medical professional services**. Repeated or related acts, errors or omissions by one or more **insured**s will be treated as one **medical incident**. Such a **medical incident** will be considered to have occurred at the time the first act, error or omission was committed.

78.     The StarStone Policy defines **medical professional services** as follows:

> **Medical Professional Services** mean the health care services or the treatment of a **patient** including medical, surgical, dental, nursing, psychiatric, osteopathic, chiropractic or other health care professional services; furnishing or dispensing of prescription drugs, blood, blood products, medical, surgical or dental supplies; furnishing of food or beverage in connection with such treatment; and the providing of counseling or social services in connection with such treatment or care. **Medical professional services** includes the **insured**'s committee activities for accreditation, quality assurance, peer review and standards review.

79.     The allegations in the Underlying Action that ALG failed to provide PCS to Medicaid residents of certain adult care homes it manages in North Carolina in accordance with DMA policy falls squarely and unequivocally within the StarStone Policy's coverage for the "alleged or actual act, error or omission" in ALG's "rendering or failing to render" "medical, nursing, and other health care services."

80.     The provision of the StarStone Policy that sets forth StarStone's defense obligations requires StarStone to drop down and provide a defense for any claim that is otherwise covered by the StarStone Policy whenever the OneBeacon Policy does not cover such a claim:

> F. **DEFENSE OF CLAIMS OR SUITS.**
> 1. We will have no duty to defend any **claim** or suit that any other insurer has a duty to defend. If we elect to join the defense of such **claims** or suits, we will pay all expenses we incur.
>
> 2. *We will have the right and duty to defend any suit for **damages*** which are payable under this Policy (including **damages** wholly or partly within the **retained limit**) but *which are not payable by a Policy of **underlying insurance***, or any other available insurance, *because*:
>
>> a. *such **damages** are not covered*; or

b. the **underlying insurance** has been exhausted by the payment of **claims.** (Emphasis added.)

81.     The StarStone Policy defines **damages** as follows:

> **Damages** mean a monetary judgment, award or settlement, which can include punitive or exemplary damages except in those jurisdictions which prohibit insurance coverage for such punitive or exemplary damages. **Damages** shall not include fines, taxes or penalties, nor other amounts deemed uninsurable as a matter of law.

82.     The Underlying Action is a "suit for **damages**" as set forth in the duty-to-defend provisions of the StarStone Policy.

83.     ALG provided timely notice to StarStone by providing a copy of the First Amended Complaint.

84.     In response to ALG's notice, StarStone agreed to provide coverage of the Underlying Action upon satisfaction of the **applicable underlying limit** and subject to a standard reservation of the right to deny coverage if there is a determination in the Underlying Action of facts that place the claims outside of the StarStone Policy coverage.

85.     Specifically, in a letter to ALG dated November 2, 2017, StarStone said, "StarStone will provide a defense of this matter subject to the exhaustion of the primary policy limits and the reservations of rights set forth herein." A copy of the November 2, 2017 reservation of rights letter is attached as <u>Exhibit D</u> (the "StarStone ROR Letter").

86.     The StarStone ROR Letter sets forth numerous coverage and exclusionary provisions of the StarStone Policy and reserves the right to deny coverage at a later time if facts are developed in the Underlying Action that bring the claims within an exclusion.

19

87.     The StarStone ROR Letter does not claim that the allegations in the Underlying Action fall outside of the coverage grant of the StarStone Policy.  Instead, it asserts that facts could potentially develop in the Underlying Action that would make certain exclusions in coverage applicable to the claims.

88.     Specifically, StarStone asserts that the two exclusions set forth in Section C of the Policy could potentially apply.  Those exclusions provide as follows:

> C. This insurance does not apply to any liability, damage, loss, cost or expense arising out of:
>
> CONTRACTUAL LIABILITY
>
> 1. For which the **insured** assumed liability under a contract or agreement. However, if insurance for liability assumed under a contract or agreement is provided by the **underlying insurance.**
>      a. This exclusion shall not apply; and
>      b. The insurance provided by this Policy will not be broader than the insurance coverage provided by the **underlying insurance.**
>
> CRIMINAL ACTS
>
> 2. Any **damages** or liability which arises out of any criminal, dishonest or fraudulent act, or any willful violation of any statute, rule or law by an **insured**.
>
> We will defend **claims** applicable to EXCLUSION C.2. until admission of guilt or final adjudication during a criminal proceeding. If any **insured** committed the conduct specified in EXCLUSION C.2., such **insured** will reimburse us for any **defense costs** advanced to said **insured**.

89.     In fact, neither of these exclusions apply to any of the claims alleged in the Underlying Action.

90.     There are no "liabilities" alleged in the Underlying Action that ALG or

Trefzger ever "assumed under a contract or agreement" with anyone. The claims in the Underlying Action are, instead, that ALG and/or Trefzger failed to provide PCS to Medicaid residents of certain adult care homes managed by ALG in North Carolina, and therefore, the submission of claims for reimbursement for such PCS to DMA were "false."

91.     Accordingly, the "Contractual Liability" exclusion cannot have any application to ALG's or Trefzger's claims for coverage.

92.     Similarly, the "Criminal Acts" exclusion does not apply to preclude coverage of any of the claims in the Underlying Action. The Underlying Action is, of course, a civil action not a criminal one.

93.     In addition, there has been no "admission of guilt or final adjudication during a criminal proceeding," because there is no "criminal proceeding" in which such an admission or adjudication exists.

94.     Indeed, ALG and Trefzger intend to prove in the Underlying Action that the claims are, in the words of the StarStone Policy, "groundless, false or fraudulent."

95.     The StarStone ROR Letter also incorrectly claims that "coverage provided by this Policy shall not apply to any **Claim** under Insuring Agreements A., B. or any request for reimbursement under Insuring Agreements that is or is alleged to be based upon, arising out of, directly or indirectly resulting from, or in consequence of a confirmed violation of FCA or NC FCA."

96.     There is, in fact, not a word or phrase anywhere in the StarStone Policy that mentions or relates in any way to a violation or alleged violation of the FCA or NC FCA.

97. The StarStone ROR Letter also says that StarStone has no duty to provide coverage if a final confirmation of fraud were to be found:

> Pursuant to the provisions of the Policy, Starstone Specialty Insurance Company agrees to monitor this lawsuit against Affinity Living Group, LLC. However, this letter serves to apprise you, on behalf of StarStone, of certain limitations in your coverage. Specifically, we must advise you that the lawsuit sounds in fraud and violations of the FCA and NC FCA. As defined above, the allegations being asserted could be construed as a "criminally or intentionally malicious act." Thus there would be no coverage under the Policy if a Claim was made under the Policy for this occurrence and a confirmation of fraud has been found.

98. StarStone may not deny coverage based upon the foregoing reservation.

99. First, StarStone is incorrect that the allegations "could be construed" as a crime. No criminal action has been brought by any government entity against ALG, Trefzger, or any of the remaining 47 corporate defendants in the Underlying Action. In fact, the governments declined to become parties to the *civil* Underlying Action following their respective investigations of the Relator's claims. This leaves solely the *civil* claims as set forth in the Relator's First Amended Complaint.

100. Second, there is no exclusion anywhere in the StarStone Policy that precludes coverage for claims that allege an "intentionally malicious act."

101. In short, while the StarStone ROR Letter admits that the allegations in the Underlying Action are potentially covered by the StarStone Policy, there are, in fact, no exclusions in coverage that are in any way potentially applicable to any of the claims in the Underlying Action.

102. After receiving the StarStone ROR Letter, ALG notified StarStone that OneBeacon had recently denied all coverage under the OneBeacon Policy and that, therefore, the drop-down provisions of the StarStone Policy required StarStone to comply with its duty to defend and indemnify ALG. A copy of ALG's November 22, 2017 notice letter to StarStone is attached as Exhibit E.

103. Instead of complying with its agreement to provide a defense to ALG and Trefzger under a reservation of rights, StarStone sent ALG's November 22, 2017 notice letter to outside insurance coverage counsel for review.

104. StarStone had an obligation under its duty of good faith and fair dealing to ALG and Trefzger to comply with its agreement to provide a defense to ALG and Trefzger in the Underlying Action.

105. In a letter dated December 6, 2017 from Gary L. Glassman, Esq. of the Cozen O'Connor law firm (the "Glassman Denial Letter"), StarStone reneged on its prior agreement to provide a defense to ALG in the Underlying Action, leaving ALG and Trefzger to fend for themselves despite the clear coverage obligations set forth in the StarStone Policy. A copy of the Glassman Denial Letter is attached as Exhibit F.

106. The Glassman Denial Letter incorrectly, falsely, and improperly asserts that the First Amended Complaint "does not allege **damages** resulting from a **claim** arising out of a **medical incident**."

107. The Glassman Denial Letter admits that the term **applicable underlying limit** "can mean the **retained limit** if the policies of **underlying insurance** do not apply

to the **occurrence** or **medical incident** and such **occurrence** or **medical incident** is otherwise covered under the Umbrella Policy."

108.    In addition, the Glassman Denial Letter admits that the allegations in the Underlying Action involve claims arising from "Personal Care Services" that were allegedly "not provided to or did not meet the needs as assessed of Alzheimer's or other memory-impaired Medicaid beneficiaries residing within Special Care Units of the defendants' adult-care homes located in North Carolina."

109.    The Glassman Denial Letter, however, intentionally takes an inappropriately narrow view of the broad coverage grant in the StarStone Policy for the purpose of improperly denying ALG's claim.

110.    Allegations that ALG did "not provide to or did not meet the needs as assessed of" its residents at the Special Care Units are the very heart of the coverage the StarStone Policy provides for claims of "an alleged or actual act, error or omission in the **insured's** rendering or failure to render" **Medical Professional Services** (which is broadly defined as "the health care services or the treatment of a **patient** including medical, surgical, dental, nursing, psychiatric, osteopathic, chiropractic or other health care professional services; furnishing or dispensing of prescription drugs, blood, blood products, medical, surgical or dental supplies; furnishing of food or beverage in connection with such treatment; and the providing of counseling or social services in connection with such treatment or care").

111.    If the alleged failure to meet the needs of its patients is not an act, error, or omission for which the StarStone Policy provides coverage, then ALG's purchase for more

than $300,000 in premiums the Healthcare Umbrella Professional Liability insurance coverage from StarStone was entirely illusory.

112. The Glassman Denial Letter falsely and in bad faith misrepresents the scope of Exclusion A.2, asserting that, "even if there was a medical incident involved, it would have occurred prior to the inception date of the Umbrella Policy and Exclusion A.2 would preclude coverage."

113. Exclusion A.2 does not preclude coverage for medical incidents that occur prior to the inception of the StarStone Policy (which was August 1, 2016), as the Glassman Denial Letter falsely claims. Instead, Exclusion A.2 precludes coverage for any medical incident that "takes place prior to the *Retroactive Date shown in Item 3.(a) of the Declarations*." (Emphasis added.) The Retroactive date is August 10, 2010.

114. Exclusion A.2 precludes coverage for a medical incident prior to the inception date of the Policy *only* if ALG "had knowledge" of the medical incident prior to the inception date.

115. Had StarStone conducted the good-faith investigation that North Carolina requires before it denied coverage, it would have learned that no one at ALG had any knowledge of any medical incident prior to August 1, 2016. Indeed, no one at ALG *could* have had such knowledge because the claims of medical incidents alleged in the Underlying Action are, in the words of the StarStone Policy, "groundless, false or fraudulent." ALG could not have known about medical incidents that, in fact, never took place.

116.   In any event, there was no evidence in the possession of StarStone either at the time of its November 2, 2017 agreement to provide coverage, or at the time its counsel issued the Glassman Denial Letter, that would suggest or support a claim that anyone at ALG had knowledge of the medical incident alleged in the Underlying Action prior to inception of the StarStone Policy.

117.   As StarStone is aware, the *alleged* occurrence of an act, error, or omission arising from ALG's Professional Care Services is sufficient to trigger coverage under the StarStone Policy.

118.   The Glassman Denial Letter falsely and in bad faith claims that, "to the extent that the damages sought by Gugenheim involve the return to the United States and North Carolina of any payments they made to the defendants, such amounts would not constitute an insurable loss and would not be covered."

119.   StarStone is fully aware that, although insurers routinely include in their liability policies exclusions for loss, costs, or damages for reimbursement and/or restitution, no such exclusionary language appears anywhere the StarStone Policy in connection with Insuring Agreement A.   The Glassman Denial Letter, therefore, intentionally misrepresents the terms and conditions of coverage under the StarStone Policy.

120.   The remainder of the Glassman Denial Letter analyzes coverage under Insuring Agreement B, which is not the Insuring Agreement that applies to the Claims asserted in the Underlying Action and the reservations of the Glassman Denial Letter are, in that respect, therefore irrelevant.

121.   It is noteworthy that the Glassman Denial Letter does *not* claim that the underlying OneBeacon Policy provides coverage for the Underlying Claim and that, therefore, ALG must exhaust the $1 million limits of liability in the OneBeacon Policy before the StarStone Policy is triggered.

*StarStone's Violation of the Unfair Claims Settlement Practices Act*

122.   StarStone had an obligation under the North Carolina Unfair Claims Settlement Practices Act, N.C. Gen. Stat. § 58-63-15 ("NCUCSPA"), to handle ALG's claim fairly and in good faith.

123.   The following acts constitute violations of the NCUCSPA:

a.   Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

\*\*\*

d.    Refusing to pay claims without conducting a reasonable investigation based upon all available information;

\*\*\*

f.    Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;

g.    Compelling [the] insured to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insured;

\*\*\*

m.    Failing to promptly settle claims where liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage; and

> n. Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

124. The intentionally false, misleading, and inaccurate representations about the coverage provided by the StarStone Policy that are set forth in the Glassman Denial Letter violate N.C. Gen. Stat. § 58-63-15(11)(a), (f), and (n).

125. StarStone failed to interview anyone from ALG before sending the Glassman Denial Letter.

126. StarStone did not request any additional information beyond the First Amended Complaint from ALG or, upon information and belief, from any other source, before sending the Glassman Denial Letter.

127. Upon information and belief, StarStone conducted no investigation of any kind whatsoever before sending the Glassman Denial Letter.

128. StarStone's denial of coverage to ALG and Trefzger without first conducting a good-faith and thorough investigation of the facts of the Underlying Action constituted a violation of N.C. Gen. Stat. § 58-63-15(11)(d).

129. StarStone's agreement, as set forth in the StarStone ROR Letter, to provide coverage and a defense of the Underlying Action under a reservation of rights constitutes an admission that liability under the StarStone Policy had become reasonably clear.

130. It was only after StarStone learned that it could be required under the provisions of the StarStone Policy and the circumstances of this claim to drop down and provide an immediate defense of the Underlying Action (without a pre-requisite exhaustion

of the $1 million liability limits in the OneBeacon Policy) that it sent the claim to outside coverage counsel in an attempt to justify reneging on its agreement to defend.

131. Nothing substantive transpired in the Underlying Action between StarStone's November 2, 2017 agreement to provide coverage and December 6, 2017, the date of the Glassman Denial Letter, to change any of the facts or circumstances that affect coverage of the claims or the applicability of any exclusion in the StarStone Policy.

132. The only event that occurred between November 2, 2017 and December 6, 2017 was that StarStone became aware that OneBeacon had denied all coverage for the Underlying Action and had taken the position that the OneBeacon Policy does not apply to the claims in the Underlying Action, thus making StarStone immediately liable to comply with the coverage obligations to which it had agreed in the StarStone ROR Letter, rather than becoming liable sometime in the distant future (if ever), after exhaustion of OneBeacon's $1 million limits of liability.

133. In short, StarStone's denial of its coverage obligations a mere month after having agreed to comply with them was a bad-faith attempt to protect its own pocketbook at the expense of its insured in violation of N.C. Gen. Stat. § 58-63-15(11)(m).

134. StarStone now relies on the intentionally dishonest and misleading representations about the "pertinent facts or insurance policy provisions relating to coverages at issue" set forth in the Glassman Denial Letter to justify reneging on its coverage obligations.

135. By refusing to provide the coverage that it previously admitted it was required to provide, StarStone has compelled ALG and Trefzger to file this litigation to

obtain the benefits due under the StarStone Policy in violation of N.C. Gen. Stat. § 58-63-15(11)(g).

136.    By refusing to provide the defense that it previously admitted it was required to provide, StarStone has forced ALG and Trefzger to expend substantial amounts of their own time, money, and resources defending themselves in the Underlying Action.

137.    By refusing to provide the coverage that it previously admitted it was required to provide, StarStone has forced ALG and Trefzger into a "two-front battle," defending themselves in the Underlying Action, and battling their insurer for the coverage that is due under the StarStone Policy.

### StarStone's breach of the duty of good faith and fair dealing

138.    "An insurance company is expected to deal fairly and in good faith with its policyholders." *Robinson v. N. Carolina Farm Bureau Ins. Co*., 86 N.C. App. 44, 50, 356 S.E.2d 392, 395–96 (1987).

139.    "[W]hen there is an identifiable tort even though the tort also constitutes, or accompanies, a breach of contract, the tort may itself give rise to a claim for punitive damages." *Robinson v. N. Carolina Farm Bureau Ins. Co*., 86 N.C. App. 44, 49, 356 S.E.2d 392, 395 (1987) (quoting *Baker v. Winslow*, 184 N.C. 1, 5, 113 S.E. 570, 572 (1922).

140.    "Even when sufficient facts are alleged to make out an identifiable tort, however, the tortious conduct must be accompanied by or partake of some element of aggravation before punitive damages will be allowed." *Newton v. Standard Fire Insurance Co*., 291 N.C. 105, 111–12, 229 S.E.2d 297, 301 (1976).

141.     In the sense used here, aggravated conduct has long been defined to include "*fraud*, malice, gross negligence, insult, ... willfully, or under circumstances of rudeness or oppression, *or in a manner which evinces a reckless and wanton disregard of the plaintiff's rights.*" *Robinson v. N. Carolina Farm Bureau Ins. Co*., 86 N.C. App. 44, 49, 356 S.E.2d 392, 395 (1987) (quoting *Baker v. Winslow*, 184 N.C. 1, 5, 113 S.E. 570, 572 (1922). (Emphasis added.)

142.     Where a claim should be paid but the insurer refuses to do so in an effort to force the policyholder to undertake further process to settle the claim, such behavior will support a cause of action for bad-faith claim handling. *Robinson v. N. Carolina Farm Bureau Ins. Co*., 86 N.C. App. 44, 50–51, 356 S.E.2d 392, 396 (1987).

*143.*     The insurer in *Robinson* initially agreed to pay the insured's fire loss in full, but later reneged on that agreement and forced the insured into an appraisal process.

144.     StarStone initially agreed to provide coverage to ALG but reneged one month later on the basis of deceptive and misleading representations about the facts and the policy provisions, forcing ALG and Trefzger to file this coverage action.

145.     StarStone's treatment of ALG and Trefzger in this case is similar to the carrier's treatment of the insured in *Robinson*, which the Court of Appeals found supports a claim for bad-faith claim handling: "The evidence forecast by the plaintiff would be sufficient for the jury to infer that the defendant should have paid the full claim promptly because it had no basis upon which to deny it, that the refusal was in bad faith, and that the defendant's actions were designed solely to force the plaintiff to go through the independent

appraisal process to receive the full claim." *Robinson v. N. Carolina Farm Bureau Ins. Co.*, 86 N.C. App. 44, 50–51, 356 S.E.2d 392, 396 (1987).

146.    By reneging on its agreement to provide coverage, relying on the misrepresentations in the Glassman Denial Letter to justify its actions, and forcing ALG and Trefzger to engage in coverage litigation to protect their rights, StarStone has: (a) misrepresented pertinent facts and insurance policy provisions relating to the coverages at issue, (b) refused to pay this claim without conducting a reasonable investigation based upon all available information, (c) failed in good faith to effectuate prompt, fair, and equitable settlement of this claim, in which liability is reasonably clear, (d) compelled ALG and Trefzger to institute litigation to recover amounts due under the StarStone Policy, and (e) failed to provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim.

147.    StarStone's conduct violated its common-law duty of good faith and fair dealing to ALG and Trefzger under settled North Carolina law.

*StarStone's violation of the North Carolina Unfair and Deceptive Trade Practices Act*

148.    Chapter 75 of the General Statutes makes the following declaration: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."  N.C. Gen. Stat. § 75-1.1(a).

149.    N.C. Gen. Stat. § 75-16 provides: "If any person shall be injured or the business of any person, firm or corporation shall be broken up, destroyed or injured by reason of any act or thing done by any other person, firm or corporation in violation of the

32

provisions of this Chapter, such person, firm or corporation so injured shall have a right of action on account of such injury done, and if damages are assessed in such case judgment shall be rendered in favor of the plaintiff and against the defendant for treble the amount fixed by the verdict."

150.    Although the UDTPA expressly applies to "consumers," it is also available for the protection of business customers. *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 710 (2001).

151.    Although no violation of the NCUCSPA "shall of itself create any cause of action in favor of any person other than the Commissioner [of Insurance]," proof of a violation of the NCUCSPA is relevant to the question whether an insurer has violated the UDTPA.

152.    Violation of the UDTPA requires proof of three factors: (1) an unfair or deceptive act or practice, or unfair method of competition, (2) in or affecting commerce, and (3) that proximately caused actual injury to the plaintiff or his business.

153.    An "unfair act" is any act that offends established public policy or that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. *Johnson v. Phoenix Mut. Life Ins. Co.*, 300 N.C. 247, 266 S.E.2d 610 (1980).

154.    Under the UDTPA, the insurance business is one "in commerce," as an "exchange of value" occurs when a consumer purchases a policy. *Pearce v. American Defender Life Ins. Co.*, 316 N.C. 461, 343 S.E.2d 174 (1986).

155.    StarStone has developed a pattern and practice of denying its coverage obligations under umbrella policies that have a drop-down obligation in the event that the

underlying primary policy does not provide coverage. StarStone's pattern and practice is to require policyholders to institute litigation to force StarStone to comply with its drop-down coverage obligations.

156.     StarStone has developed a pattern and practice of using outside insurance coverage counsel to justify denial of claims for coverage in cases where the facts and the policy language would require StarStone to provide an immediate defense of claims that underlying primary insurers have denied.

157.     StarStone employs its pattern and practice of using outside insurance coverage counsel to justify denial of claims for coverage as a cover for its failure to conduct a reasonable investigation based upon all available information.

## COUNT I
(For Declaratory Judgment)

158.     ALG and Trefzger repeat the allegations in the foregoing paragraphs as if fully set forth here.

159.     By reason of the foregoing, there is an actual case and controversy between OneBeacon and StarStone, on the one hand, and ALG and Trefzger, on the other hand, concerning their respective rights and obligations under the OneBeacon Policy and the StarStone Policy.

160.     Under 28 U.S.C. § 2001, this Court may declare the rights and legal obligations of the parties to this action.

161.     By reason of the foregoing, OneBeacon has improperly denied its coverage obligations to ALG and Trefzger.

162. In the alternative, and by reason of the foregoing, StarStone improperly denied its coverage obligations to ALG and Trefzger.

WHEREFORE, Plaintiffs Affinity Living Group, LLC and Charles E. Trefzger, Jr. demand entry of judgment as follows:

a. Declaring that OneBeacon has breached its obligations to ALG and Trefzger by denying both defense and indemnity liability insurance coverage for the Underlying Action.

b. Declaring that StarStone has breached its obligations to ALG and Trefzger by denying both defense and indemnity liability insurance coverage for the Underlying Action.

c. Awarding such other relief as this Court deems just and appropriate.

## COUNT II
(Breach of Contract)

163. ALG and Trefzger repeat the allegations in the foregoing paragraphs as if fully set forth here.

164. By reason of the foregoing, OneBeacon has breached its contractual obligations to ALG and Trefzger.

165. In the alternative, and by reason of the foregoing, StarStone has breached its contractual obligations to ALG and Trefzger.

WHEREFORE, Plaintiffs Affinity Living Group, LLC and Charles E. Trefzger, Jr. demand entry of judgment as follows:

a.      Awarding ALG and Trefzger damages as a consequence of the breach of contract by OneBeacon.

b.      Awarding ALG and Trefzger damages as a consequence of the breach of contract by StarStone.

c.      Awarding pre-judgment interest on any amounts recovered.

d.      Awarding such other relief as this Court deems just and appropriate.

## COUNT III
### (Breach of the Common Law Duty of Good Faith and Fair Dealing)

166.      ALG and Trefzger repeat the allegations in the foregoing paragraphs as if fully set forth here.

167.      By reason of the foregoing, StarStone has breached its duty of good faith and fair dealing to ALG and Trefzger.

WHEREFORE, Plaintiffs Affinity Living Group, LLC and Charles E. Trefzger, Jr. demand entry of judgment as follows:

a.      Awarding ALG and Trefzger damages as a consequence of the breach of the duty of good faith and fair dealing by StarStone.

b.      Awarding ALG and Trefzger punitive damages in an amount sufficient to punish and deter StarStone from engaging in bad faith conduct in the future.

c.      Awarding pre-judgment interest on any amounts recovered.

d.      Awarding such other relief as this Court deems just and appropriate.

## COUNT IV
### (For Violation of the North Carolina Unfair and Deceptive Trade Practices Act)

168. ALG and Trefzger repeat the allegations in the foregoing paragraphs as if fully set forth here.

169. By reason of the foregoing, StarStone has violated the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq.*

WHEREFORE, Plaintiffs Affinity Living Group, LLC and Charles E. Trefzger, Jr. demand entry of judgment as follows:

a. Awarding ALG and Trefzger damages as a consequence of StarStone's violation of the UDTPA.

b. Awarding ALG and Trefzger treble damages against StarStone, as provided by N.C. Gen. Stat. § 75-16.

c. Awarding ALG and Trefzger the attorneys' fees and costs incurred in bringing this action against StarStone, as provided by N.C. Gen. Stat. § 75-16.1.

d. Awarding ALG and Trefzger punitive damages in an amount sufficient to punish and deter StarStone from engaging in bad faith, unfair, and deceptive conduct in the future.

e. Awarding pre-judgment interest on any amounts recovered.

f. Awarding such other relief as this Court deems just and appropriate.

Dated: January 17, 2017

**WALDREP LLP**

/s/ *Thomas W. Waldrep, Jr.*
Thomas W. Waldrep, Jr. (NC State Bar No. 11135)
Francisco T. Morales (NC Bar No. 43079)
101 S. Stratford Road, Suite 210
Winston-Salem, NC 27104

Telephone: 336-717-1440
Telefax: 336-717-1340
Email: notice@waldrepllp.com

\-   and -

**BRAMNICK, RODRIGUEZ, GRABAS, ARNOLD &
MANGAN, LLC**

Carl A. Salisbury (NJ State Bar No. 013991992)
1827 East Second Street
Scotch Plains, NJ 07076
Telephone: 908-322-7000 ext. 146
Telefax: 908-322-7016
Email: csalisbury@jonbramnick.com

*Attorneys for Plaintiffs Affinity Living Group, LLC and
Charles E. Trefzger, Jr.*

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all claims so triable.